UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON JACKSON, | No. 1:23-cv-00509-JLT-EPG (PC) |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS THAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED |
| v. | |
| HEATHER SHIRLEY, et al., | (ECF No. 40) |
| Defendants. | OBJECTIONS, IF ANY, DUE WITHIN THIRTY (30) DAYS |

## I.      INTRODUCTION

Plaintiff Aaron Jackson is a state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action filed pursuant to 42 U.S.C. § 1983. This case proceeds on Plaintiff's Eighth Amendment conditions of confinement claim against Defendants Shirley, Cronjager, and DeGough, stemming from Plaintiff's allegations that the levels of trichloropropane ("TCP") in the water at Wasco State Prison ("WSP") were unsafe for consumption. (ECF No. 11).

On September 15, 2025, Defendants filed a motion for summary judgment. (ECF No. 40). Plaintiff filed his brief in opposition on October 14, 2025 (ECF No. 43), and Defendants filed their reply in support of summary judgment on October 28, 2025 (ECF No. 44).

For the following reasons, the Court will recommend that Defendants' motion for summary judgment (ECF No. 40) be granted.

\\\

\\\

1

## II.    PLAINTIFF'S AMENDED COMPLAINT

Plaintiff filed his amended complaint on August 23, 2023.[1] (ECF No. 11). In his amended complaint, Plaintiff alleges that the water at Wasco State Prison is contaminated, and that Defendants have not appropriately responded to the issue. (*Id.*). Plaintiff alleges as follows:

Plaintiff sues several WSP employees: Heather Shirley, Warden; J. Cronjager, Head of Health and Safety; and Scott DeGough, Plant Operations Manager. (ECF No. 11 at 2).

For Claim I, which Plaintiff labels "safety & security," Plaintiff alleges that Scott DeGough, as acting water contractor, relayed false information to WSP staff. (*Id.* at 3). He "hid the danger of the contaminated carcinogenic water filled with 1,2,3 trichloropropane [("TCP")]." (*Id.*). "If Scott DeGough would have monitored the true risk of the dangerous toxin & told his superiors the truth of the risk of stomach ailments & risk of cancer." (*Id.*).

Plaintiff alleges that Cronjager, as the head of health and safety, "has a sworn duty to always second guess, investigate, and go above and beyond to make sure that this water is not toxic [and] infested with chemicals that kill and cause cancer." (*Id.*). This is a violation of their duty and Plaintiff's civil rights to have access to clear drinking water. (*Id.*).

Plaintiff further alleges that Defendants Shirly, Cronjager, and DeGough "have exhibited actions that put [Plaintiff's] life in danger." (*Id.*). Warden Shirley "is the overseer of the prison's wellbeing" and "did not implement a productive plan to remedy the bad water situation." (*Id.*).

For Claim II, which Plaintiff labels as Eighth Amendment living conditions and cruel and unusual punishment, Plaintiff alleges that Warden Shirley outlawed bottled water for sale as an alternative to drinking toxic water. (*Id.* at 4). Plaintiff is forced to drink toxic water. Wasco City and prison as well as [city of] Shafter drink water from wells 1 and 2.

Plaintiff asserts that Warden Shirley and Cronjager work and possibly live in Kern County and "due to the constant news stories and magazine articles and newspapers reporting the failed water in this county, I know that all three defendants knew about and continue to know about the

---

[1] Initially, Plaintiff joined other defendants in filing their complaint in *Thomas v. Shirley, et al.*, 1:23-cv-00470-JLT-BAM (E.D. Cal. March 28, 2023). Subsequently, the Court issued an order severing Plaintiff from that action and directing Plaintiff to file an individual complaint in his own case. Order to Sever Action, ECF No. 8, *Thomas v. Shirley, et al.*, 1:23-cv-00470-JLT-BAM (E.D. Cal. April 5, 2023).

toxic water in the Wasco State Prison. (*Id.*) Plaintiff alleges that "the City of Shafter was told to not drink any of this water and the prison staff knows that it has been failing a federal standard for TCP toxin in the California systems for years now." (*Id.*). Wasco Prison set a date from December 2017 to fix this problem plaguing Plaintiff and inmate population in three years, yet five plus years later, and the problem still exists, and it gets worse. (*Id.*) For his injury, Plaintiff again refers to "affidavits" but does not attach affidavits. (*Id.*).

Plaintiff also alleges Claim III, an Eighth Amendment conditions of confinement violation "due to ingesting contaminated, cancerous water, and becoming ill." (*Id.* at 5.) Plaintiff again repeats his allegations against Cronjager, alleging that by his actions and inaction, Plaintiff's life and his health are being endangered. (*Id.*) Cronjager has full knowledge of the severe risks and dangers within the institution regarding the infected water issue, and knows the protocols for such risks and dangers, and knows what is to be done about them. Plaintiff against alleges that Cronjager has a "duty to always second guess, investigate, and go above and beyond to make sure that WSP is properly informed of/on health and safety risks, as well as making sure that the institution's water is not unsanitary, or contaminated with carcinogens that are a threat to [Plaintiff's] life and safety." (*Id.*).  Plaintiff alleges that Cronjager failed in his duty. (*Id.*).

Plaintiff asserts that he has become "internally ill with illnesses that cause[s] Plaintiff great internal pain, abdominal pain, bowel movement pain, erosive gastritis, gastroesophageal reflux disease, internal hemorrhoids." (*Id.*). Plaintiff alleges that he had none of these illnesses until being incarcerated at WSP. (*Id.*).  Finally, Plaintiff alleges that his injuries are "due to Defendant Cronjager's negligence and indifference to the hazardous condition of confinement [Plaintiff has] been subjected to by the failure of his action, and by the disregard in [Cronjager's] inactions." (*Id.*). Plaintiff seeks compensatory damages in the amount of $2.5 million dollars. (*Id.* at 6).

On April 11, 2024, the Court reviewed Plaintiff's amended complaint and issued a Screening Order. (ECF No. 12). The Court found that "all three [claims] appear to be Eighth Amendment conditions of confinement claims" and all "claims against defendants Shirley, DeGough, and Cronjager should proceed past screening." (*Id.* at 2, 8).

\\\

3

### III.    MOTION FOR SUMMARY JUDGMENT

#### A. Defendants' Motion for Summary Judgment

On September 15, 2025, Defendants filed a motion for summary judgment. (ECF No. 40). Defendants argue that (1) "WSP's water was safe to drink;" (2) "TCP did not cause any of [Plaintiff's] medical conditions;" (3) "WSP constructed a filtration system that removes TCP from WSP's water;" and (4) Defendants' involvement and responsibilities in responding to California's maximum contaminate level ("MCL") change and WSP's TCP levels did not cause Plaintiff harm. (ECF No. 40-2 at 7-12). Defendants also argue that they are entitled to qualified immunity. (ECF No. 40-2 at 19-22).

Defendants state that there is "no evidence that [Plaintiff] actually suffered harm from the water at WSP" and that "[w]hile [Plaintiff alleges that he suffered a number of symptoms and ailments, these conditions are either inconsistent with TCP exposure or there are no records of Jackson developing such conditions." (ECF No. 40-2 at 16 (citing DUF 22-23)). Defendants also argue that their medical expert reviewed Plaintiff's "medical records and concluded that none of [Plaintiff's] alleged illnesses were caused by any exposure to TCP in WSP's water." (*Id.* (citing DUF 23-27)). Defendants further argue that Plaintiff's "TCP exposure [is] significantly lower than the reference dose." (*Id*. (emphasis omitted); ECF No. 40-7 at 7).

In support of their argument, Defendants attached (1) a separate statement of undisputed facts in support of Defendants' motion for summary judgment (ECF No. 40-3); (2) a declaration of former warden H. Shirley (ECF No. 40-4); (3) a declaration of former Associate Warden J. Cronjager (ECF No. 40-5); (4) a declaration of correctional plant manager S. DeGough (ECF No. 40-6); (5) a declaration of medical expert Timur S. Durrani, M.D., M.P.H. (ECF No. 40-7); (6) a declaration of California Deputy Attorney General Connor Nordstrom, which attaches a transcript of Plaintiff's deposition, taken on June 13, 2025 (ECF No. 40-8); and (7) a "Rand" warning to Plaintiff (ECF No. 40-1).

#### B. Plaintiff's Opposition to Defendants' Motion for Summary Judgment

In opposition to summary judgment, Plaintiff states that "the water at Wasco State Prison was/is contaminated" and argues that "Defendants rely on animal testing and incomplete studies; yet, they never tested the actual effects on humans[;] without such testing, it cannot be

definitively stated that the contamination was harmless to prisoners." (ECF No. 43 at 2). Plaintiff states that he has "experienced documented medical problems" including "acid reflux disease, gastritis, migraines, acne, and a minor form of cancer after drinking the contaminated water." (*Id*.). Plaintiff asserts that the "causal connection between [his] medical issues and exposure to unsafe water presents factual questions that a jury must resolve." (*Id*.).

As to Defendants' argument for qualified immunity, Plaintiff states that "Defendants knew or should have known that the contaminated water was unsafe" and "their failure to provide safe drinking water or to protect prisoners from risks cannot be shielded by qualified immunity." (*Id*.).

Plaintiff did not include any evidence in support of his opposition.  Plaintiff also did not file a separate statement of undisputed facts as required by Local Rule 260(b).

### C. Defendants' Reply in Support of Summary Judgment

In their reply in support of their motion for summary judgment, Defendants argue that Plaintiff fails to provide admissible evidence to establish a genuine dispute of material fact regarding his Eighth Amendment claims. (ECF No. 44 at 2-4). Defendants state that "Plaintiff does not, and cannot, dispute that his consumption of water at WSP was over 2000 times less than the reference dose of TCP, that is the dose of daily oral exposure for a chronic duration that is likely to have **no** appreciable risk of deleterious effects." (ECF No. 44 at 3). Defendants point to the declaration of their expert, Dr. Durrani, and argue that "there is undisputable evidence of the effects of TCP on humans." (*Id*. at 3, n1). Defendants argue that "Plaintiff provides no facts to dispute Dr. Durrani's conclusion that Plaintiff did not suffer any harm from the water at WSP as his symptoms were either inconsistent with TCP exposure or there was no record of Plaintiff developing such conditions." (*Id*. at 3).

Defendants assert that their involvement in responding to the new MCL was limited to the specific roles they held at WSP, and "they had little control over the completion of the filtration system, which had already begun prior to Plaintiff's arrival at WSP in 2022." (*Id*.). Furthermore, Defendants argue that Plaintiff fails to offer any evidence that they knew of and disregarded a serious risk to his health, or that their response was inadequate. (*Id*.). "Rather, the undisputed evidence demonstrates that Defendants could not have been deliberately indifferent as they were

never informed at any point that the water at WSP posed any health risk or that WSP needed to provide an alternative source of water." (*Id.*).

## IV.  LEGAL STANDARDS

### A. Motion for Summary Judgment

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (*en banc*) ("If there is a genuine dispute about material facts, summary judgment will not be granted."). A party asserting that a fact cannot be disputed must support the assertion by

> citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party does so, "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial," which is not a light burden, the party "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322.

Additionally, "[a] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

In reviewing the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record . . . from which a reasonable inference . . . may be drawn"; the Court need not entertain inferences that are unsupported by fact. *Celotex*, 477 U.S. at 330 n. 2 (citation omitted). In reviewing a summary judgment motion, the Court may consider other materials in the record not cited by the parties but is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

**B. Conditions of Confinement**

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which [the prisoner] is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). Conditions of confinement may, consistent with the Constitution, be restrictive and harsh. *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). Prison officials must, however, provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." *Toussaint v. McCarthy*, 801 F.2d 1080, 1107 (9th Cir. 1986), *abrogated in part on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995); *see also Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).

Two requirements must be met to show an Eighth Amendment violation through unconstitutional conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "First, the deprivation alleged must be, objectively, sufficiently serious." *Id.* (citation and internal quotation marks omitted). And where this is an allegation concerning "a failure to prevent harm, the inmate must show that he [was] incarcerated under conditions posing a substantial risk of serious harm." *Id.*

Second, "a prison official must have a sufficiently culpable state of mind," which for conditions of confinement claims "is one of deliberate indifference." *Id.* (citations and internal

7

quotation marks omitted). Prison officials act with deliberate indifference when they know of and disregard an excessive risk to inmate health or safety. *Id.* at 837. The circumstances, nature, and duration of the deprivations are critical in determining whether the conditions complained of are grave enough to form the basis of a viable Eighth Amendment claim. *Johnson,* 217 F.3d at 731. Mere negligence on the part of a prison official is not sufficient to establish liability, but rather, the official's conduct must have been wanton. *Farmer*, 511 U.S. at 835; *Frost v. Agnos,* 152 F.3d 1124, 1128 (9th Cir. 1998).

## V.    ANALYSIS

In light of Defendants' considerable evidence that the water at WSP during the relevant time was safe to drink, the Court addresses whether there is a genuine dispute of fact as to whether the conditions, i.e., the water at WSP, posed a substantial risk of serious harm as required for an Eighth Amendment claim for unconstitutional conditions of confinement.

### A.  Defendants' Evidence Regarding Lack of Substantial Risk of Serious Harm

The Court begins by evaluating the evidence Defendants have submitted on this issue in their motion for summary judgment.

Defendants' Statement of Facts, citing to and supported by evidence, states as follows: Plaintiff arrived at WSP on September 8, 2022. (ECF No. 40-3 at 2). From January 2022 through August 2025, the water was tested and notices from the independent laboratory's findings were posted quarterly at the institution. (*Id.* at 3). The tests revealed TCP level results that ranged from 0.000 ug/L to 0.024 ug/L. (*Id.*). Notices reporting the independent laboratory's findings regarding the levels of TCP in WSP's water were posted quarterly throughout the prison in compliance with California regulations. (*Id.*). The quarterly notices stated that the TCP levels did not present an emergency and that inmates did not need to use an alternative source of water, like bottled water. (*Id.*). Rather, they indicated that "'some people who drink water containing 1, 2, 3-trichloropropane in excess of the MCL over many years may have an increased risk of getting cancer,' and encouraged those concerned about other health issues to consult a doctor." (*Id.*).

Defendants also submit the declaration of their medical expert, Timur Durrani. (ECF No. 40-7). Dr. Durrani is a medical doctor with a Master of Public Health degree. (*Id.* at 2). He serves as the Medical Director for Occupational Health Services at the Zuckerberg San Francisco General

Hospital and Trauma Center ("ZSFG"). (*Id.*). Dr. Durrani also serves as a Medical Toxicology consultant for the Agency for Toxic Substances and Disease Registry, region 9, the Environmental Protection Agency, region 9, and the Western States Pediatric Environmental Health Specialty Unit ("PEHSU"). (*Id.*). Dr. Durrani has other credentials. For example, he serves as Assistant Medical Director for the San Francisco Division of Poison System and the UCSF Faculty of Record for the courses Medicine 180, Occupational Toxicology and Medicine 140.43, Clinical Toxicology and Pharmacology. (*Id.*). Dr. Durrani is also a member of multiple professional organizations, including the American College of Medical Toxicology. He is the past President of the California Academy of Preventative Medicine and has been on numerous committees related to occupational and environmental medicine and toxicology. (*Id.* at 3).

Dr. Durrani reviewed Plaintiff's complaint, a transcript of Plaintiff's June 13, 2025, deposition, Plaintiff's CDCR medical records, WSP's quarterly drinking water notices and consumer reports from April 2021 through August 2025. (*Id.* at 4).

On the question of whether the water at WSP posed a substantial risk of serious harm to Plaintiff, Dr. Durrani states, under penalty of perjury:

> Based on my review of Wasco State Prison's quarterly water notices, I am aware that Wasco State Prison cited concentrations of 0.000 μg/L and 0.024 μg/L from January 2022 to August 2025.
>
> TCP is a man-made chlorinated hydrocarbon that is typically used as an industrial solvent and as a cleaning and degreasing agent. It is a colorless liquid with an odor similar to chloroform. TCP in pure form is likely to exist as a dense, nonaqueous phase liquid and, thus, will sink to the bottom of a groundwater aquifer because its density is greater than that of water.
>
> In 1992, TCP was added to the list of chemicals known to the State of California to cause cancer under California's Safe Drinking Water and Toxic Enforcement Act. In 1999, the California State Water Quality Control Board established a 0.005 μg/L drinking water notification level for TCP. This level was based on cancer risks derived from laboratory animal studies as reviewed by the U.S. Environmental Protection Agency (EPA). It is reasonably anticipated to be a human carcinogen per the U.S. National Toxicology Program. The International Agency for Research on Cancer (IARC) has also classified TCP as probably carcinogenic to humans based on sufficient evidence of carcinogenicity in experimental animals. To my knowledge, there have not been any human studies evaluating the risk of TCP and cancer.

\\\
\\\

9

To date in the scientific literature, three articles reported acute medical conditions in humans, which described a total of four people who were exposed to TCP. The first case involved a 20-year-old male college student majoring in chemical engineering from a northwest city in China working in a nonventilated environment with industrial paint with a pungent smell for one hour without personal protective equipment (PPE). The second case involved an 18-year-old male worker from a village in central China exposed to an industrial paint environment with a pungent smell for 8 hours a day without PPE for three days. Both cases resulted in a severe liver injury requiring hospitalization, but they fully recovered. The third case was a worker who had been painting internal walls for six days in confined spaces for up to eight hours at a time. He was hospitalized and diagnosed with acute toxic leukoencephalopathy, a neurological disorder that damages the brain's white matter. His injuries were attributed to TCP in the manufacture of paints. His blood TCP level was 7.6 ng/mL. After intensive treatment and care, he recovered. The fourth person exposed to TCP was a farmer who initially presented to a local hospital in Bao-ding City, Hebei Province, after ingesting 10-15 mL of liquid as a bet 27 hours earlier. He developed fulminant liver failure. His blood level of TCP was 7500 µg/L. He left the hospital with his family before definitive treatment could be provided and was lost to follow-up.

There is also one human study evaluating the relationship between maternal residential proximity to industrial air releases of chlorinated solvents, including TCP. Neural tube defects in the offspring of 41 case mothers and 2847 control mothers were followed. The researchers found a statistically significant increase in neural tube defects in children born to mothers who had residential proximity to air emissions of chlorinated solvents, including TCP. These outcomes only affect infants of pregnant women.

There is no federal maximum contaminant level (MCL) for TCP in drinking water, but the Environmental Protection Agency requires many large water utilities to monitor for TCP with a minimum reporting level of 0.03 µg/L. Some states have established their own MCLs. For example, Hawaii established a state MCL of 0.6 µg/L. In December 2017, a California regulation established an MCL of 0.005 µg/L. The regulation went into effect on January 1, 2018. The regulation also required all water systems in California to conduct quarterly monitoring for TCP in water sources.

Although Wasco State Prison's water contained TCP concentrations above the MCL, acute and chronic medical conditions are not expected to occur for Mr. Jackson from exposure to TCP in Wasco State Prison's water from September, 2022 to August 2025. There are no reports of acute or chronic medical conditions in the scientific literature for a three-year exposure to the concentration of TCP reported in the water at Wasco State Prison.

Mr. Jackson's daily ingestion of TCP can be estimated using the Drinking Water Ingestion Exposure Dose Formula as described in the Public Health Assessment Guidance Manual (PHAGM) from the Agency for Toxic Substances and Disease Registry, a federal public health agency of the U.S. Department of Health and Human Services. Based on my review of Jackson's deposition transcript, it is my

understanding that while incarcerated at Wasco State Prison, Jackson consumed 8.5 quarts of water per day, which converts to 8 liters per day (approximately two and one-eighth gallons). Based on my review of Mr. Jackson's medical records, it is my understanding that his body weight, at its lowest, was reported at 97 kg in 2023. Using the highest inorganic TCP level reported at Wasco State Prison during the relevant time period (0.024 ug/L), a daily intake rate of 8.5 quarts of water (8 liters per day), an exposure factor of 1, as he had daily, chronic exposure, and at his lowest recorded body weight of 97 kg, Mr. Jackson's daily TCP dose during the relevant time period was 0.00000196 mg/kg/day.

According to the EPA, the Reference Dose for TCP is 0.004 mg/kg/day. The Reference Dose is an estimate of daily oral exposure for a chronic duration (up to a lifetime) to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime. Because Mr. Jackson's daily, chronic exposure dose of 0.00000196 mg/kg/day is significantly lower than the EPA's Reference Dose of 0.004 mg/kg/day, Mr. Jackson's exposure to TCP between September 2022 and August 2025 would not be expected to have even a minimal risk of harmful effects during his lifetime.

The EPA's most specific definition of chronic exposure is "Repeated exposure by the oral, dermal, or inhalation route for more than approximately 10% of the life span in humans." Jackson does not meet the EPA's definition of chronic exposure because his exposure duration lasted only three years.

Similarly, Mr. Jackson does not meet the most specific EPA definition of chronic effect, defined as "the effect of a stimulus that lingers or continues for a relatively long period, often one-tenth of the life span or more." Because Mr. Jackson's exposure duration lasted three years, and he is 44 years old, he does not meet this definition.

Mr. Jackson alleges that by using the water at Wasco State Prison, he developed gastroesophageal reflux disease, gastritis, and hemorrhoids. Mr. Jackson also asserts that he was told he had cancer, or that he had cancer and was taking medication for it. Mr. Jackson also testified to having acne breakout and biweekly migraine headaches.

Based on my review of Mr. Jackson's medical records from Wasco State Prison, there is no medical record of Mr. Jackson's alleged effects at the time of or following the alleged exposure.

Accordingly, the evidence does not support Mr. Jackson's claimed injury of cancer, acne, gastroesophageal reflux disease, gastritis, or migraine headaches as being caused by exposure to TCP in Wasco State Prison's water between 2022 and 2025.

Based on my professional training and experience, my review and understanding of authoritative texts and articles in peer review medical literature on the subject of TCP, and my review of Mr. Jackson's medical records, deposition transcript, and

11

complaint, it is my professional opinion that Mr. Jackson's assertions that he suffers, or will suffer in the future, any adverse health effects from drinking water at Wasco State Prison, as detailed above, are mistaken. There is no evidence that Mr. Jackson was exposed to TCP in Wasco State Prison's water in sufficient amounts for a sufficient length of time to cause the alleged to his health. Further, as detailed above, according to the authoritative research in this area, there is no clinical evidence that consuming TCP in this concentration for the period of time Mr. Jackson consumed it would result in the conditions alleged by Mr. Jackson. Therefore, it is my opinion with a reasonable degree of medical, toxicological, and scientific certainty, that Mr. Jackson's exposure to TCP in his drinking water is not the cause of any of the acute or chronic conditions he alleges.

*Id.* at 4-8 (internal numbering and footnotes omitted).

Defendants also provide a declaration from Defendant J. Cronjager, retired Associate Warden from Wasco State Prison. (ECF No. 40-5). Defendant J. Cronjager served in that role from 2013 until retiring in December 2021, and supervised plant operations. (*Id.* at 1). Defendant J. Cronjager states that beginning in January 2018, a California regulation required quarterly testing of 1,2,3-TCP in drinking water, and Wasco's water was tested and monitored accordingly. (*Id.* at 1-2). Although test results showed levels above the maximum contaminant level, notices were posted indicating there was no emergency and no need for alternative water sources. (*Id.* at 2).

As additional evidence, Defendants provide a declaration from Defendant S. DeGough, the Correctional Plant Manager II at Wasco State Prison. (ECF No. 40-6). Defendant S. DeGough states that at all relevant times, the prison's water came from two wells supplying both inmates and staff. (*Id.* at 1-2). Defendant S. DeGough acknowledges a 2018 California regulation setting a strict limit on 1,2,3-TCP levels in drinking water and confirms that Wasco conducted quarterly testing as required. (*Id.* at 2). He states that WSP's water was tested by independent laboratory Environmental Agricultural Analytical Chemists, and DeGough attached the original water records maintained by WSP to his declaration. (*Id.*).

TCP levels between the third quarter of 2022 and the third quarter of 2025 (during inmate Plaintiff's incarceration) exceeded the limit but were not deemed an emergency. (*Id.* at 2-3). Defendant S. DeGough oversaw water records and posted state-mandated notices informing inmates that while the water was non-compliant, it was not dangerous, and no alternative water source was needed. (*Id.*).

12

The final declaration provided is from Defendant H. Shirley, a former Warden at Wasco State Prison, from June 27, 2022, to January 16, 2024. (ECF No. 40-4). Defendant H. Shirley was generally aware that drinking water came from wells shared by staff and inmates. (*Id.* at 2).

Upon review, the Court concludes that Defendants have presented sufficient evidence showing that, while the TCP levels at times exceeded California's MCL, they did not pose a substantial risk of serious harm to Plaintiff. Most notably, Defendants have presented the expert opinion of Dr. Durrani, who opines that, although Wasco State Prison's water contained TCP above the state regulatory limit, Plaintiff's estimated exposure was far below levels associated with health risks and did not meet EPA's criteria for chronic exposure or chronic effect. Moreover, there is no medical or scientific evidence linking Plaintiff's alleged symptoms to TCP exposure.

Based on this evidence, the Court concludes that Defendants have met their burden of presenting sufficient evidence to show an absence of a genuine issue of material fact as to whether WSP water posed a substantial risk of serious harm to Plaintiff.

### B. Plaintiff's Evidence Regarding Substantial Risk of Serious Harm

In his opposition brief, Plaintiff did not respond to Defendant's Statement of Undisputed Facts or indicate that any of those facts were disputed, as required by Local Rule 260(b). Plaintiff also did not file any evidentiary documents supporting the allegations in his complaint or his arguments in opposition to summary judgment. Fed. R. Civ. P. 56(e).

Instead, in his opposition brief, Plaintiff states generally that "genuine issues of material fact exist regarding the dangers of the water" because "the water at Wasco State Prison was/is contaminated." (ECF No. 43 at 2). Plaintiff argues that "Defendants rely on animal testing and incomplete studies; yet they never tested the actual effects on humans [and] without such testing it cannot be definitively stated that the contamination was harmless to prisoners." (*Id.*). Plaintiff provides no expert witness testimony or other evidence to support his arguments.

The Court finds that these unsupported arguments do not raise a genuine dispute of fact on the issue of whether the WSP water posed a substantial risk of serious harm. Plaintiff's own lay opinion about the dangers posed by WSP's water, or TCP, is not admissible. Fed. R. Civ. P. 701. Moreover, Plaintiff does not present any expert opinion of his own about the harm posed by

WSP's water. Plaintiff also lacks other admissible evidence, such as scientific journals, medical records, or statements from Defendants, showing that the TCP levels in WSP's water posed a substantial risk of serious harm.  Moreover, Plaintiff's argument that Defendants' evidence does not definitively show that contamination was harmless to prisoners misstates Plaintiff's own burden to submit evidence in support of his claim.

Plaintiff has thus failed to raise a genuine dispute of material fact that the water at WSP posed a substantial risk of serious harm. Therefore, Defendants are entitled to summary judgment on Plaintiff's claim against them based on unconstitutional conditions of confinement.[2]

## VI.    CONCLUSION AND RECOMMENDATIONS

For the above reasons, IT IS RECOMMENDED that:

1. Defendants' motion for summary judgment (ECF No. 40) be GRANTED; and

2. Judgment be entered in Defendants' favor, and that the Clerk of Court be directed to close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within thirty (30) days after being served with these findings and recommendations, any party may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any objections shall be limited to no more than fifteen (15) pages, including exhibits. Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)). IT IS SO ORDERED.

Dated:    **February 19, 2026**                    /s/ Erica P. Grosjean
                                                    UNITED STATES MAGISTRATE JUDGE

---

[2] Because the Court finds that this issue is sufficient to resolve the parties' motions, it declines to address the other arguments raised by the parties including whether Defendants acted with deliberate indifference or are entitled to qualified immunity.